Kendall DILLON *v.* STATE of Arkansas

CR 92-58                                        844 S.W.2d 944

Supreme Court of Arkansas
Opinion delivered January 19, 1993

531

*Harold W. Madden* and *Tom F. Donovan*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Clint Miller*, Senior Asst. Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. The appellant, Kendall Dillon, raises sixteen points in his appeal from a conviction for rape and a sentence of thirty-three years. Three points concern prosecutorial misconduct in the cross-examination of two defense witnesses and of Dillon himself. We agree that the cumulative effect of statements made by the prosecutor in the cross-examination was prejudicial to Dillon and denied him a fair trial. We, therefore, reverse and remand the case for a new trial.

## FACTS

On November 19, 1990, Kendall Dillon, who at the time was a Pulaski County Deputy Sheriff, was charged with the crime of rape. The charge resulted from an incident that occurred at about 5:00 a.m. on October 10, 1990, when Dillon, who was in his patrol car, stopped Tammy Falcone, an employee of the Checkmate Club, near McCain Mall in North Little Rock. According to Falcone's testimony, Dillon called in her license and tag numbers and informed her that a warrant had been issued for her arrest for hot checks. He instructed her to follow him to her car. She obeyed, and followed him to Sherwood, where they parked in a lot near Kiehl Avenue. Dillon ordered her into his car and then drove her to a secluded gravel road.

Falcone offered Dillon her tip money if he would let her go, but he replied that he wanted her, not her money. She told him that she wanted to go home to her children, but Dillon began playing with her hair, kissing her, fondling her breasts, and

inserting his fingers in her vagina. Falcone testified that she feared she would die if she attempted to get away. When a car passed by, Dillon stopped. He then returned her to her car and warned her not to tell anyone.

Two days later, on October 12, 1990, Dillon stopped Brenda Kaup, according to her testimony at trial, and instructed her to raise her brassiere and pull down her pants and panties while she sat in his patrol car. No criminal charges were filed in connection with that incident, but Kaup sued Dillon in federal district court. Kaup's testimony was admitted at Dillon's trial.

Dillon was convicted and sentenced after a three-day trial.

## I. PROSECUTORIAL MISCONDUCT

Dillon points to several instances of prejudicial statements made by the prosecutor at trial, none of which was supported by proof.

The first was in the form of a question on cross-examination to Lieutenant Mike Adams of the Pulaski County Sheriff's Department under whom Dillon worked:

> PROSECUTOR: Were you aware of any complaints against Mr. Dillon about his treatment of women, particularly threatening to plant drugs on them in exchange for sex?

> DEFENSE COUNSEL: Your Honor, I object to that characterization; it is a leading statement.

> THE COURT: Don't lead your witness, Ms. Ferrell. You may rephrase the question.

> DEFENSE COUNSEL: Your Honor, may I approach the bench?

> THE COURT: Please do.

> (THEREUPON, counsel for the State and counsel for the Defense approached the bench and conferred with the Court, out of the hearing of the jury, as follows:)

> DEFENSE COUNSEL: Your Honor, that question was leading. The allegation was made from specific acts, and I would —

THE COURT: I sustained your objection to the leading.

DEFENSE COUNSEL: And it was rude of Ms. Ferrell because of the specific act that was implied.

PROSECUTOR: He opened the door by saying that he did a good job and how he arrested these women in performance of his duties is relevant to how he would do his job.

DEFENSE COUNSEL: Not to that kind of question, Your Honor. He didn't open any door, and I do move for a mistrial.

THE COURT: Denied.

DEFENSE COUNSEL: And I ask for the Court to instruct the jury. The question was improper and they're to disregard it.

THE COURT: I'm not going to over-emphasize it, but . . . I'm going to sustain your objection to the leading question.

Without any proof to support the insinuation, the prosecutor forged the distinct impression in the minds of the jurors that complaints against Dillon existed for threatening to plant drugs on women in exchange for sex.

The second improper comment occurred in the prosecutor's cross-examination of Chief Deputy Jerry Bradley of the Faulkner County Sheriff's Department:

PROSECUTOR: Well, were you aware of whether — Were you aware that the defendant resigned from the Conway Police Force?

BRADLEY: Yes.

PROSECUTOR: So you are aware of why he re-signed from the Conway Police Force?

BRADLEY: I have no direct knowledge of why he resigned.

PROSECUTOR: You have no direct knowledge?

BRADLEY: No.

PROSECUTOR: You have no direct knowledge, but you are aware that it's because he forced sex on —

DEFENSE COUNSEL: Your Honor, I want to object to her making any statement of —

THE COURT: Now, just a minute. If he doesn't know why, doesn't have any direct knowledge of it, then that's it.

PROSECUTOR: Are you also aware that he resigned from the Morrilton Police Force?

BRADLEY: Yes, Ma'am.

PROSECUTOR: So you're aware of why he resigned there, as well, aren't you?

BRADLEY: No.

PROSECUTOR: And are you aware —

BRADLEY: I have no direct knowledge of why he resigned from any department. He also worked for Mayflower at one time, but I —

PROSECUTOR: And you know he resigned from Mayflower?

BRADLEY: Yes.

PROSECUTOR: And you know he resigned from UCA?

BRADLEY: I'm sorry. I don't ever remember him working for UCA.

PROSECUTOR: As a security at UCA?

BRADLEY: No, I don't. I don't remember that.

PROSECUTOR: So you're aware that he resigned from Mayflower, that he resigned from Conway, he resigned from Morrilton, and now you're aware that he resigned from the Pulaski County Sheriff's Department. Is that correct?

BRADLEY: I didn't know he had resigned from Pulaski County. I didn't know what his involvement there was.

PROSECUTOR: And are you aware that these were all forced resignations?

DEFENSE COUNSEL: Your Honor, I want to object to that. And at this time, Your Honor, may I approach the bench?

(THEREUPON, counsel for the State and counsel for the Defense approached the bench and conferred with the Court, out of the hearing of the jury, as follows:)

DEFENSE COUNSEL: Your Honor, the witness has testified that he had no direct knowledge. She is asking, "Are you aware that he was forced to resign?" He's already said he had no direct knowledge. At this time, I'd move for a mistrial. She has prejudiced us before this jury —

THE COURT: But —

DEFENSE COUNSEL: — and it's totally prejudicial, after he said that he had no direct knowledge of it.

THE COURT: How much more do you want him to say about it?

PROSECUTOR: I elicited of him — but this is my last question of this witness.

DEFENSE COUNSEL: It's one too many, Your Honor.

THE COURT: I'm not going to order a mistrial at this point, but don't do that any more.

PROSECUTOR: Okay, no, Your Honor.

THE COURT: You're that close to it.

PROSECUTOR: I don't dare.

DEFENSE COUNSEL: And, Your Honor, at this time, we'd ask —

THE COURT: Your motion is denied.

DEFENSE COUNSEL: But — Now, I understand that, but I have one more, and I ask that the jury be instructed to disregard that question.

(THEN, in the hearing of the jury.)

THE COURT: All right. Ladies and gentlemen of the jury, you'll disregard that last question which was asked by Ms. Ferrell. Let's move along. Any other questions of Chief Deputy Bradley?

PROSECUTOR: No, Your Honor.

Here, the prosecutor adroitly presented a mandated resignation due to "forced sex" in Faulkner County and then suggested "forced resignations" or suspensions in four other law enforcement agencies, including the Pulaski County Sheriff's Department and one security position at the University of Central Arkansas. Again, no proof was presented by the state to substantiate these implications of the most serious order. It is evident that the trial judge was alarmed by this strategy, and he told the prosecutor that she was "that close" to a mistrial.

The prosecutor next cross-examined Dillon on his suspensions from various law enforcement agencies:

PROSECUTOR: And you testified on direct that you've been a police officer with the Pulaski County Sheriff's Department for seven and a half years. Right?

APPELLANT: Yes.

PROSECUTOR: And that you left the Narcotics Division when you were promoted. Correct?

APPELLANT: Yes.

PROSECUTOR: But during that seven and a half years, that wasn't the first time you were suspended, was it?

APPELLANT: No.

PROSECUTOR: You'd been suspended before for taking a woman to —

DEFENSE COUNSEL: Your Honor, I want to object.

. . . .

THE COURT: You may ask him if he has been suspended and then ask him what for. If it goes to truthfulness, I'll allow it.

PROSECUTOR: Okay.

(THEN, in the hearing of the jury.)

PROSECUTOR: Have you been suspended before?

APPELLANT: Yes.

PROSECUTOR: What was it for?

DEFENSE COUNSEL: Your Honor, at this time, I'd like to state that unless it has do with truthfulness or untruthfulness, I would object to the question.

THE COURT: Well, you see, I don't know.

DEFENSE COUNSEL: Well, then no proper foundation has been laid for the question.

THE COURT: Overruled. Go ahead.

PROSECUTOR: What was it for?

APPELLANT: I'd have to refer to the letter of suspension. I believe it was for not remaining quiet in school and misuse of a department vehicle.

PROSECUTOR: Misuse of a department vehicle? What did you misuse it for?

DEFENSE COUNSEL: Your Honor, I object. That has nothing to do with truthfulness or untruthfulness.

(THEREUPON, counsel for the State and counsel for the Defense approached the bench and conferred with the Court, out of the hearing of the jury, as follows:)

THE COURT: Do you have proof as to what he's been suspended for?

PROSECUTOR: Yes, I do.

THE COURT: Well, ask him those specific questions that deal with truthfulness or untruthfulness, and using a vehicle improperly would not go to that. I'll just give you a little hint.

PROSECUTOR: Okay.

In an *in camera* conference with trial counsel, the prosecutor indicated that she wished to ask two more questions about alleged prevarications by Dillon but did not intend to back up the questions with witnesses. A discussion then followed:

THE COURT: Aren't those questions sort of like do you still beat your wife?

PROSECUTOR: Your Honor, they are prior incidences of —

THE COURT: (Interposing) Well, that is fine if you can back those up and prove them, then that is proper, but just to ask them and have no proof of it is not only improper, it is not fair. Is that the only two other questions you have left?

PROSECUTOR: Yes.

THE COURT: Okay. Let's don't ask those. And you can go back and finish up with something else if you like.

PROSECUTOR: Okay.

When error accumulates in a criminal case, this court has recognized that the impact may be prejudicial, and we have reversed a decision by the trial court. *Harris* v. *State*, 264 Ark. 391, 572 S.W.2d 389 (1978). We considered a motion to suppress a search warrant in *Harris* and concluded that the warrant should have been suppressed as defective. The municipal court did not adequately specify on the warrant the place to be searched. Also, the judicial officer made no finding whether it was a daytime or nighttime search (the warrant may have been served as early as 5:00 a.m.), and no receipt for the items seized was given the defendant. The trial court noted "pretty much of a total disregard for the rules" but refused to find prejudice. We reversed due to the "accumulation of error," saying:

It might be that alone the discrepancies in this case would not amount to prejudicial error. However, when considered together, we must conclude that the almost total disregard for the Rules cannot be ignored. What it all comes down to is where do we draw the line? We draw the line here. The State has not demonstrated that a reasonably good faith effort was made to comply with the Rules. The evidence is, in fact, to the contrary.

264 Ark. at 395, 572 S.W.2d at 391.

A second case from a foreign jurisdiction approximates the case at bar and offers additional justification for reversal. *See State* v. *Soares*, 815 P.2d 428 (Hawaii 1991). The offense at issue in *Soares* was the robbery of a convenience store. The appellants were convicted and, on appeal, urged prosecutorial misconduct. The Hawaii Supreme Court agreed and reversed and remanded, giving as part of its reasoning the following:

We have repeatedly stated that "[t]he duty of the prosecution is to seek justice, to exercise the highest good faith in the interest of the public and to avoid even the appearance of unfair advantage over the accused." [Citing authority.] In this case, the record contains numerous examples of the prosecutor's disregard for appellants' right to a fair trial. For example, during jury selection, the prosecutor asked a prospective juror her feelings about someone who did something wrong but did not have adequate counselling in his or her "formative years." After Soares' counsel objected and asked the court to instruct the prospective jurors not to infer from any of the attorneys' questions that anyone had done anything wrong, the prosecutor remarked, "if nobody has done anything wrong, we wouldn't be here."

Further examples of the prosecutor's misconduct include the prosecutor's repeated attempts to introduce evidence previously excluded by motion in limine, numerous "speaking objections," and leading questions.

Although no single instance of prosecutorial misconduct substantially prejudiced appellants' right to a fair trial, we find that the cumulative weight of the prosecutor's

improper conduct was so prejudicial as to deny appellants a fair trial. [Citing authority.]

815 P.2d at 430-431.

In the present case, the prosecutor crafted a mosaic of a defendant who 1) had planted drugs on women in exchange for sex; 2) had resigned from the Conway Police Department because he had forced sex on someone; 3) had been forced to resign from four other law enforcement agencies and one security job, apparently for the same reason; and 4) had been suspended from the Pulaski County Sheriff's Department for "taking a woman," the implication in light of the charge and the other insinuations being that the woman was taken for sex.

As in *Soares*, the prosecutor's accumulated remarks in this case combined to deny Dillon a fair trial. One comment built on the next until the jury could readily have believed that Dillon had been fired repeatedly from law enforcement positions because he forced sex on women. Yet the prosecutor offered no evidence that any one of these accusations was true. The net result was guilt by insinuation.

■ We cannot say that the prosecutor's comments, overly zealous as they were, did not taint the jury's decision and, indeed, we conclude exactly to the contrary. Our system of criminal justice is founded on the twin cornerstones of fairness and proof beyond a reasonable doubt. Here, the appellant was subjected to an onslaught of accusations which he had no way of defending against because the accusations were unsubstantiated. The prejudice to his case was palpable.

## II. POINTS ON RETRIAL

There are several points that may well reoccur in a second trial.

On cross-examination, the State was allowed to use a transcript to inquire into whether Dillon had told the truth while testifying under oath in a court proceeding on October 26, 1984. In the earlier trial, the appellant declared that he had not made any specific promises to the defendant in that case; later, however, a tape was played in which it was clear that he had indeed made promises.

The appellant contends that this cross-examination violated A.R.E. 608(b), which bans, in general terms, proof of "[s]pecific instances of the conduct of a witness" by extrinsic evidence. But the Rule leaves to the court's discretion the decision whether to permit inquiry concerning those instances that concern a witness's "character for truthfulness or untruthfulness."

██ Reference to a transcript of a prior proceeding involving the witness for the purpose of impeaching that same witness in the current trial is not the kind of extrinsic evidence prohibited by Rule 608(b). *See* 1 J.W. Strong, *McCormick on Evidence*, § 41, at p. 141 (4th Ed. 1992). We have also held that the credibility of a witness may be attacked, under Rule 608, under the following conditions: "1) the question must be asked in good faith, 2) the probative value must outweigh its prejudicial effect, and 3) the prior conduct must relate to the witness'[s] truthfulness." *Mackey* v. *State*, 279 Ark. 307, 316, 651 S.W.2d 82, 86 (1983).

██ Here, the prosecutor merely inquired into the past episode, and nothing in the record suggests that the question was not asked in good faith. The probative value of the query was high, given the critical need for the jury to evaluate the credibility of Dillon versus that of Tammy Falcone. No prejudice resulted to Dillon because the question elicited nothing about other sexual offenses. The point of the inquiry on cross-examination was to explore Dillon's propensity for truthfulness. Accordingly, the questioning was permissible.

██ Dillon also objected to the testimony of Lieutenant Mike Adams concerning what Dillon told him about what happened when he pulled Falcone over to run a "warrant check." This was improper, the appellant urges, because he had not received his *Miranda* warnings. However, at the time Dillon spoke with Adams, he was not "in custody" or "under arrest." Hence, the *Miranda* requirement was not operative. *Shelton* v. *State*, 287 Ark. 322, 699 S.W.2d 728 (1985). Moreover, the appellant never sought a *Denno* hearing prior to trial as provided for by Ark. Code Ann. § 16-89-107(b)(1) (1987).

The circuit court allowed Brenda Kaup, Dillon's purported victim on October 12, 1990, to testify under A.R.E. 404(b) because her testimony was evidence that Dillon followed a

particular plan, or *modus operandi*, with Tammy Falcone. Dillon's plan, as revealed by Kaup's testimony, was consistent with the circumstances depicted in Falcone's testimony. According to the respective testimony, both women were unaccompanied when they were pulled over. Both women were accused of crossing the center line, and both were ordered to get into the patrol car. Both women had family out of town: Falcone's husband was in Saudi Arabia, and Kaup's family lived out of state. In Kaup's case, she stated that Dillon threatened to take her in for DWI but said perhaps he could work something out. At that point he obliged her to expose herself to him under the pretext of searching for drugs. He then released her and followed her to her babysitter's house.

■ We have held that *modus operandi* evidence is admissible in rape cases to prove a common plan. *Tarkington* v. *State*, 250 Ark. 972, 469 S.W.2d 93 (1971). This situation fits squarely within that holding.

■ Finally, "serious physical injury" is not an element of the crime of rape, and the circuit court correctly refused the appellant's proffered modified version of AMCI 1803.

Reversed and remanded.

HAYS, GLAZE, and CORBIN, JJ., dissent.

DONALD L. CORBIN, Justice, dissenting. Today, this court has determined that three improper questions by the prosecution amounts to prosecutorial misconduct and results in accumulation of error necessitating reversal. This, in spite of the fact that accumulation of error was not raised by appellant as a ground for reversal. Let us examine and discuss the sequence of the objections to the issues raised within the framework of this three day trial.

The first instance of alleged prosecutorial misconduct arose early in the trial when the prosecutor asked Lt. Mike Adams "[w]ere you aware of any complaints against Mr. Dillon about his treatment of women, particularly threatening, to plant drugs on them in exchange for sex?" This was the prosecution's first attempt to elicit testimony from a witnesses about improper behavior by appellant toward other women. Appellant objected to the question on the basis it was leading and asked for a mistrial.

The court sustained appellant's objection, but denied his motion for a mistrial. Upon denial of his motion for a mistrial, appellant asked that the jury be admonished to ignore the question. The court refused to instruct the jury to disregard the question saying "I'm not going to over-emphasize it, but . . . I'm going to sustain your objection to the leading question." Appellant contends a mistrial should have been granted, but if a mistrial was not necessary, the trial court should have admonished the jury to disregard the question. Appellee argues appellant suffered no prejudice because the witness never answered the question and the instruction by the court at the end of the trial to the jury that "arguments, statements and remarks made by attorneys are not evidence and are to be disregarded if they have no basis in the evidence" cured any possible prejudice.

We have stated many times that the trial court has wide latitude of discretion in granting or denying a motion for mistrial and we will not reverse the decision of the trial court except for an abuse of discretion or manifest prejudice to the complaining party. *Strawhacker* v. *State*, 304 Ark. 726, 804 S.W.2d 720 (1991). I fail to find that the trial court abused its discretion in failing to grant a mistrial nor do I believe the denial of a mistrial resulted in manifest prejudice to appellant. The question was never answered by the witness and there was, therefore, no evidence before the jury about appellant threatening to plant drugs on women in exchange for sex. *See Bussard* v. *State*, 295 Ark. 72, 747 S.W.2d 71 (1988).

However, the refusal of the trial court to admonish the jury to disregard the question is a separate issue. Trial courts have wide discretion in evidentiary questions. *Hubbard* v. *State*, 306 Ark. 153, 812 S.W.2d 107 (1991). In denying appellant's requested admonition, the trial court said "I'm not going to over-emphasize it, but . . . I'm going to sustain your objection to the leading question." While the requested admonishment should undoubtedly have been given, the failure to give the admonishment is not reversible error in this instance. We have held that it may be proper not to give an instruction because it may call undue attention to the evidence. *Kellensworth* v. *State*, 275 Ark. 252, 631 S.W.2d 1 (1982). Additionally, appellant objected at trial only on the basis the question was leading, not that the question was prejudicial. *Bussard*, 295 Ark. 72, 747 S.W.2d 71. The

question was not answered, the trial court sustained the objection, and appellant did not inform the trial court that he wanted the admonition because the question was prejudicial. This was also the prosecuting attorney's first attempt to elicit this improper information. Under these circumstances, I cannot say the trial court abused its discretion in not giving the requested admonition to the jury.

On cross-examination, the prosecutor asked Chief Deputy Jerry Bradley whether he was aware why appellant had resigned from the Conway Police Force. The witness replied he had no direct knowledge of why he resigned. The prosecutor then asked "[y]ou have no direct knowledge, but you are aware that it's because he forced sex on—" at which point appellant objected. The trial court sustained the objection. The prosecutor then continued to question the witness about whether he knew if appellant had resigned from other police departments and whether he knew the reasons for these resignations. The witness admitted knowing appellant had resigned from two other police departments, but did not know the reasons and did not know of appellant's resignation from yet two other police departments. The prosecutor's last question to the witness was "[a]nd are you aware that these were all forced resignations?" Appellant objected to this question, a bench conference was held where appellant moved for a mistrial, which was denied, but the prosecutor was reprimanded and instructed not to "do that anymore. . . . You're that close to it." Appellant then asked for and received an instruction to the jury to disregard the question.

Appellant argues the entire line of questioning was improper and prejudicial because it put appellant in the position of defending other sexual crimes or acts other than the one at hand. At trial, appellant did not object on this basis and only objected on the basis that the witness had no direct knowledge of the reason for appellant's resignation and asking the witness about the reason prejudiced appellant. Since appellant did not argue that the entire line of questioning was improper below, we should not consider this argument on appeal. *Bussard*, 295 Ark. 72, 747 S.W.2d 71.

In any case, a mistrial is only to be granted where any possible prejudice cannot be removed by an admonition to the

jury. *Porter* v. *State*, 308 Ark. 137, 823 S.W.2d 846 (1992). Additionally, "we have held, with rare exceptions, that an admonition to the jury to disregard improper, and even prejudicial matters cures such mistakes." *Lackey* v. *State*, 283 Ark. 150, 154, 671 S.W.2d 757, 759 (1984) (Hays, J., dissenting). The trial court has wide latitude of discretion in granting or denying a motion for mistrial and we do not reverse the decision of the trial court except for an abuse of discretion or manifest prejudice to the complaining party. *Strawhacker* v. *State*, 304 Ark. 726, 804 S.W.2d 720 (1991). I fail to see an abuse of discretion or manifest prejudice in this instance.

Appellant objected to the prosecution asking appellant about his prior suspension from the Pulaski County Sheriff's Department on the basis that it did not go to truthfulness and no foundation had been laid. On appeal, appellant argues the failure of the prosecutor "to demonstrate that the 'bad acts' about which she inquired were probative of truthfulness" prior to asking the question constituted prejudicial error. The following sets out the prosecution's conduct and appellant's objections in this area:

[PROSECUTION]: [Y]ou testified on direct that you've been a police officer with the Pulaski County Sheriff's Department for seven and a half years. Right?

[APPELLANT]: Yes.

. . . .

[PROSECUTION]: But during that seven and a half years, that wasn't the first time you were suspended, was it?

[APPELLANT]: No.

[PROSECUTION]: You'd been suspended before for taking a woman to —

[APPELLANT'S COUNSEL]: Your Honor, I want to object.

(THEREUPON, counsel for the State and counsel for the Defense approached the bench and conferred with the Court, out of the hearing of the jury, as follows:)

[APPELLANT'S COUNSEL]: Your Honor, she

may ask him if he was suspended, but she may not bring up this other. It has nothing to do with truthfulness or untruthfulness

. . . .

which is what those rules require before she could do any cross examining about this.

[PROSECUTION]: Your Honor, under the Rule, it says we can cross examine him about acting as a police officer for seven and a half years. If he feels it's not relevant to this case, we can contribute this to the witness' credibility. In opening he said, I will prove it because he has worked for long standing as a police officer. That's an exact quote from the opening statements, I believe. It places his own character into issue seven and a half years later, when we —

THE COURT: You may ask him if he has been suspended and then ask him what for. If it goes to truthfulness, I'll allow it.

[PROSECUTION]: Okay.

(THEN, in the hearing of the jury.)

[PROSECUTION] CONTINUING: Have you been suspended before?

[APPELLANT]: Yes.

[PROSECUTION]: What was it for?

[APPELLANT'S ATTORNEY]: Your Honor, at this time, I'd like to state that unless it has [to] do with truthfulness or untruthfulness, I would object to the question.

THE COURT: Well, you see, I don't know.

[APPELLANT'S ATTORNEY]: Well, then no proper foundation has been laid for the question.

THE COURT: Overruled. Go ahead.

[PROSECUTION] CONTINUING: What was it for?

[APPELLANT]: I'd have to refer to the letter of suspension. I believe it was for not remaining quiet in school and misuse of a department vehicle.

[PROSECUTION]: Misuse of a department vehicle? What did you misuse it for?

[APPELLANT'S COUNSEL]: Your Honor, I object. That has nothing to do with truthfulness or untruthfulness.

(THEREUPON, counsel for the State and counsel for the Defense approached the bench and conferred with the Court, out of the hearing of the jury, as follows:)

THE COURT: Do you have proof as to what he's been suspended for?

[PROSECUTION]: Yes, I do.

THE COURT: Well, ask him those specific questions that deal with truthfulness or untruthfulness, and using a vehicle improperly would not go to that. I'll just give you a little hint.

. . . .

(THEN, in the hearing of the jury.)

[PROSECUTION]: Your Honor, may we approach?

THE COURT: Do you think we could work some of these things out if we'd take about a ten minute break so that you don't have to continue coming up, back and forth? The jury and I would like to get through with this trial sometime. Let's take about a ten minute break, ladies and gentlemen, and be back at five after 2:00.

(THEREUPON, Court was in recess until 2:05 p.m. during which time the following proceedings took place, in chambers:)

THE COURT: All right. Let's see if we can work out what you want to ask so that you don't have to have every question you ask have an objection to it and coming up to the bench.

[PROSECUTION]: Yes, Your Honor, I will be glad to do that. I have two more questions. One is, do you remember telling Lisa Craig Short's parents that you did not know where she was when, in fact, she was in your hotel room?

THE COURT: How are you going to prove that . . . if he says no? Aren't you stuck with that then and are you going to bring the girl and her parents in to testify to that?

[PROSECUTION]: No, Your Honor. First of all, I don't believe he has opened the door on direct examination for me to do that. I do have the material from the Conway Police Department that details it, Ms. Craig's statements. Also, Ms. Craig is in the audience, but I would not call her as a witness.

THE COURT: Then you propose to ask that question? Are you going to object to that?

[APPELLANT'S ATTORNEY]: When she asks it, Your Honor, I will make a motion for a mistrial.

THE COURT: I probably will grant it if you ask that question. All right. What is your next question?

[PROSECUTION]: The other question will probably be in the same vein. I just want to make sure, did he instruct a twelve year old to deceive her parents as to where she was.

THE COURT: Aren't those questions sort of like do you still beat your wife?

[PROSECUTION]: Your Honor, they are prior incidences of —

THE COURT: (Interposing) Well, that is fine if you can back those up and prove them, then that is proper, but just to ask them and have no proof of it is not only improper, it is not fair. Is that the only two other questions you have left?

[PROSECUTION]: Yes.

THE COURT: Okay. Let's don't ask those.

On appeal, appellant argues the failure of the prosecutor "to demonstrate that the 'bad acts' about which she inquired were probative of truthfulness" before she asked appellant why he had been suspended constituted prejudicial error. Questions about specific instances of a witness's prior conduct are permissible on cross-examination if they relate to truthfulness. Ark. R. Evid. 608(b).

> In interpreting Rule 608 we have adopted a three-fold test of admissibility: 1) the question must be asked in good faith, 2) the probative value must outweigh its prejudicial effect, and 3) the prior conduct must relate to the witness' truthfulness.

*Mackey* v. *State*, 279 Ark. 307, 315-16, 651 S.W.2d 82, 86 (1983). This entire colloquy indicates that the prosecutor did not ask the question in good faith. The trial judge told the prosecutor she could ask those questions which related to truthfulness. The prosecutor knew the prior instances of bad conduct by appellant which she was attempting to introduce did not relate to appellant's truthfulness. With this knowledge, she asked the improper questions. It is error to ask questions which are not probative of truthfulness. *Divanovich* v. *State*, 271 Ark. 104, 607 S.W.2d 383 (1980). However, we do not reverse for error without a showing of prejudice. *Hamm* v. *State*, 304 Ark. 214, 800 S.W.2d 711 (1990). Appellant contends it is "clear" he was prejudiced. I do not agree. The question whether appellant was "suspended for taking a woman to —" was not answered. Appellant's objection to the question was sustained. Appellant did not ask for an admonition to the jury to disregard the question. Since appellant did not request an admonition, which would have cured any potential prejudice, he cannot now complain that he was prejudiced by the question being asked. Appellant's answer that he was suspended for "not remaining quiet in school and misuse of a department vehicle" is not prejudicial. It is not probative of truthfulness, as the trial judge noted, but it does not prejudice appellant. Since there has not been a showing of prejudice, I would not reverse.

The majority cites as authority for its decision *Harris* v. *State*, 264 Ark. 391, 572 S.W.2d 389 (1978), in which we found a motion to suppress a search warrant was erroneously denied. We concluded that even though none of the errors in the search

warrant, standing alone, would require suppression, the pervasiveness of the errors contained in the search warrant necessitated suppression. The *Harris* case is simply not applicable to the case at bar. The majority also relies on *State* v. *Soares*, 815 P.2d 428 (Hawaii 1991), which was reversed because of numerous instances of prosecutorial misconduct, none of which, standing alone would have required reversal. There, the prosecutorial misconduct began during voir dire and permeated the trial. This Hawaiian case does not "approximate[] the case at bar" as the majority concludes. The case at bar involved only three instances of a prosecutor attempting to elicit improper testimony from the witnesses over a three day trial. While I agree with the majority that the prosecutor was overzealous and this conduct was improper, I think it falls short of prosecutorial misconduct.

In closing, I note that the cases in which we have reversed for cumulative error involved much more egregious instances of improper conduct and the issue of cumulative error was specifically raised on appeal. In *Alexander* v. *Chapman*, 289 Ark. 238, 711 S.W.2d 765 (1986), we reversed where there were 28 objections by appellant to leading questions, appellee was admonished repeatedly by the trial judge and the objections were repeatedly sustained, but appellee's conduct was not stopped. Appellant in *Chapman* even asked that the testimony be stricken because of the excessive use of leading questions, but the trial judge determined that striking the testimony was too harsh a sanction. In *Ronning* v. *State*, 295 Ark. 228, 748 S.W.2d 633 (1988), we said ten instances of leading questions during a lengthy trial with an evident attempt by counsel for the state to comply with the judge's directive to avoid leading questions did not require reversal. In this case, there were only three instances of improper questions presented for our consideration during a three day trial, there is no indication the trial judge was unable to control the prosecutor's actions, and the issue of cumulative error was not raised by appellant either below or on appeal.

HAYS and GLAZE, JJ., join in this dissent.